UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WENDELL R. HOWARD,                          :

             Plaintiff,                    :        10 Civ.3291(GWG)

   -v.-                                     :        OPINION & ORDER

MTA METRO-NORTH                             :
COMMUTER RAILROAD,
                                            :
           Defendant.
                                            :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Wendell Howard, proceeding pro se, brings this action pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Civil Rights Act of

1991, 42 U.S.C. § 1981, alleging that his former employer, MTA Metro-North Commuter

Railroad, discriminated against him on the basis of his race and color.  See Amended Complaint

for Employment Discrimination, filed Oct. 28, 2010 (Docket # 14) ("Am. Compl.").  Following

discovery, MTA Metro-North filed the instant motion for summary judgment.[1]  The parties have

---

[1]  See Defendant's Notice of Motion and Motion for Summary Judgment, filed May 13, 2011 (Docket # 22) ("Motion"); Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, filed May 13, 2011 (Docket # 23) ("D. Mem. of Law"); Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56.1, dated May 13, 2011 (annexed to Motion) ("D. 56.1 Stat."); Notice to Pro Se Litigant Opposing Summary Judgment Pursuant to Local Rule 56.2, dated May 13, 2011 (annexed to Motion); Declaration of Joshua Fay in Support of Defendants' Motion for Summary Judgment, dated May 13, 2011 (annexed to Motion) ("Fay Decl."); Declaration of Gregory Bradley in Support of Defendant's Motion for Summary Judgment, dated May 12, 2011 (annexed to Fay Decl.) ("Bradley Decl."); Declaration of John Meinck in Support of Defendant's Motion for Summary Judgment, dated May 13, 2011 (annexed to Fay Decl.) ("Meinck Decl.").  Howard submitted papers in opposition to the motion. See Affirmation in Opposition to Motion, filed July 7, 2011 (Docket # 28), annexing "Affirmation in Opposition to Motion for Summary Judgment" ("Pl. Affirm.") (to which the Court has added page numbers) and "Responses to Defendant's Motion for Summary Judgment" ("Pl. 56.1 Resp."); Plaintiff's Response to the Defense Attorney's Memorandum of Law Used to

consented to have this matter decided by a United States Magistrate Judge pursuant to 28 U.S.C.

§ 636(c).  For the following reasons, the defendant's motion is granted.

I.     FACTS

As an initial matter, the Court notes that Howard's opposition to the defendant's

summary judgment motion did not conform to Rule 56.1 of the Local Civil Rules of the United

States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1").

Local Rule 56.1 requires a party opposing summary judgment to respond to the movant's

statement of undisputed facts by submitting responses that cite to admissible evidence.  Local

Rule 56.1(d).  Here, while Howard's submission responds to each of the paragraphs of

defendant's Rule 56.1 statement, see Pl. 56.1 Resp., several of Howard's responses do not cite to

admissible evidence but instead simply give Howard's version of what occurred.  While we

would normally reject such evidence as inadmissible, the cover page of this document indicates

that it is signed under penalty of perjury, and it plainly references the statement that follows.

Thus, we will assume that Howard is proffering all the statements in his submission as sworn

statements. See Wali v. One Source Co., 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) ("[W]here a

pro se plaintiff fails to submit a proper [opposing statement] . . . , the Court retains some

discretion to consider the substance of the plaintiff's arguments, where actually supported by

evidentiary submissions.") (citations omitted).  Accordingly, we treat the factual assertions in the

defendant's 56.1 statement admitted only where they are not controverted by Howard's own

statement or other admissible evidence in the record identified by the parties.

--------

Support His Motion for Summary Judgment, filed July 7, 2011 (Docket # 30) ("Pl. Mem. of
Law").  MTA Metro-North submitted a reply brief.  See Reply Memorandum of Law in Further
Support of Defendant's Motion for Summary Judgment, filed July 29, 2011 (Docket # 31).

Unless otherwise noted, the following recitation of the facts is either based on undisputed facts or supports Howard's version of the events in question.

A.   <u>Howard's Employment</u>

Howard, who is African-American, began working for MTA Metro-North on or about February 4, 2008.  MTA Metro-North: New Hire Form, dated Feb. 4, 2008 (annexed as Ex. 1 to Pl. 56.1 Resp.).  Howard was hired as locomotive engineer trainee as part of MTA Metro-North's Locomotive Engineer Training Program ("LETP").  Meinck Decl. ¶ 7.  Prior to being hired, Howard was interviewed by three MTA Metro-North employees: Diana Tucker, <u>see</u> Locomotive Engineer Structured Interview and Evaluation, dated Nov. 9, 2007 (annexed as Ex. 5 to Pl. 56.1 Resp.) ("Tucker Interview"); Frank Mesa, <u>see</u> Locomotive Engineer Structured Interview and Evaluation, dated Nov. 9, 2007 (annexed as Ex. C to Fay Decl.) ("Mesa Interview"); and B. E. Anderson, <u>see</u> Locomotive Engineer Structured Interview and Evaluation, dated Nov. 9, 2007 (annexed as Ex. C to Fay Decl.) ("Anderson Interview").  There were 12 individuals in the training program, all of whom had prior experience as a locomotive engineer. Meinck Decl. ¶ 7.  Howard had previously worked as a locomotive engineer for CSX, a freight company, from 2002 to 2007.  Deposition of Wendell R. Howard, Feb. 1, 2011 (annexed as Ex. B to Fay Decl.) ("Howard Dep.") at 27.  The twelve trainees in the program were divided into three groups of four.  <u>Id.</u> at 43-44.  There was one other African-American in the twelve person program, Kenneth Page, although he was not in Howard's group of four.  <u>Id.</u> at 65.

Locomotive engineer trainees attend the LETP for approximately eleven months, during which they are considered probationary employees.  Meinck Decl. ¶ 5.  There are three phases in the LETP.  The first phase is spent in the classroom, the second involves supervised training on non-revenue "deadhead" trains, and the third involves on-the-job training with licensed

engineers.  Id. ¶ 6.  Each group of four trainees in Howard's program rotated through training on

each of Metro-North's lines: the Harlem line, the Hudson line, and the New Haven line.  Id. ¶ 8.

Trainees complete all of the training on one line before moving onto the next line.  Howard Dep.

at 53-54.  In order to advance from one line to another line, a trainee had to successfully

complete a series of final examinations.  Id. at 51-54.  Howard passed all of the final exams for

the Harlem line.  Id. at 57.  After successfully completing his exams on the Harlem line, Howard

moved on to the Hudson line.  Id.

　Meinck was the instructor responsible for training all three groups on the Harlem line.

Meinck Decl. ¶ 8.  When administering early exams, Meinck signaled to students when they

gave incorrect answers and allowed them to correct their answers.  See Howard Dep. at 72; Pl.

56.1 Resp. ¶ 9(d).  Nonetheless, Meinck marked Howard's exam answers as incorrect although

he marked other students' answers as correct even if they committed the same error Howard had.

See Pl. 56.1 Resp. ¶ 9(a).  Additionally, a question on one test did not appear to ask for a

response regarding times.  When Howard answered the question correctly except for the

applicable times, he was deducted a half-point.  After being prompted by Meinck, the other

students included the time before submitting their exams.  See Pl. 56.1 Resp. ¶ 9(b) (citing Ex. 2

at bates 218, 272, 258, 4855).  While training on the Harlem line, Howard failed one test,

although he later passed the test and was able to move on to the Hudson line.  Meinck Decl. ¶ 9.

　Howard's instructor on the Hudson line was Joanne Santiago.  Howard Dep. at 69.

Santiago made derogatory remarks about Howard to other engineers when he was not present.

Id. at 105.  She criticized him for being unprepared.  Howard Dep. at 113.[2]   Howard believes

---

　　　[2] Santiago admits telling another engineer, Lenny Carpenter, that Howard had failed a
test, but denies making any other negative comments about Howard to a wider audience.  Report

that these comments were racially motivated.  Howard Dep. at 105.

On June 4, 2008, Howard received a written warning for failing to report to duty at the specified time and failing to notify his instructor of his late arrival.  Warning Letter, dated June 4, 2008 (annexed as Ex. H to Motion) ("Warning Letter").  Howard received the letter because he missed the train he was scheduled to take from Grand Central Terminal.  Howard Dep. at 98-99.  Howard was scheduled to ride on the train as part of his training.  D. 56.1 Stat. ¶ 30. Howard has offered different explanations for why he missed the train, from the train's simply not being there, to having momentarily left the platform to get food.  See Howard Dep. at 97-98; Investigation Report at 10.

On June 25, 2008, Howard was scheduled to work in Metro-North's Croton-Harmon rail yard.  Howard Dep. at 127.  When he arrived, Howard asked the engineer who was instructing him if he could go to Grand Central Terminal to retrieve study guides.  Id. at 130.  The engineer instructor gave him permission to do so.  Id.  When Howard arrived at Grand Central he went to the training center and asked Santiago and Meinck for the study guides.  Id. at 134-35.  Meinck said they were out of copies, but gave him a book and told Howard to make the requisite copies. Id. at 135.  After Howard made the copies, he boarded a train to go back to his assigned work site, at which point he received a phone call from Meinck asking where he was assigned that day.  Id. at 137.  Immediately afterwards, Frank Mesa, the Acting Chief Training Officer, called Howard asking the same questions.  Mesa also asked Howard to get off the train and come upstairs.  Id. at 137-38.  When Howard arrived upstairs, Mesa was angry and informed Howard that an engineer cannot give permission for a trainee to leave his assigned work site to get study

of the Investigation of Wendell Howard's Complaint of Discrimination dated June 27, 2008, dated Aug. 28, 2008 (annexed as Ex. 4 to Pl. 56.1 Resp.) ("Investigation Report") at 17.

guides.  Id. at 138.  Mesa also reminded Howard that he had recently received a disciplinary

letter for missing a train.  Id.  Howard told that Mesa it was not his fault.  Id. at 138-39.  Mesa

refused to shake Howard's hand when Howard offered it and told Howard to come see him the

next day.  Id. at 139.

In an affidavit, Meinck states that he found it unusual that Howard was in the training

department offices during his workshift since he was supposed to be doing on-the-job training

with a locomotive engineer.  Meinck Decl. ¶ 10.  This is what prompted him to call Howard

shortly after Howard left the training center.  Meinck then reported the situation to Mesa.  Id.

¶¶ 10-11.  After Mesa spoke to Howard, Meinck and Mesa spoke about Howard's conduct.

They agreed that Howard "had exercised extremely poor judgment in abandoning his post and

were concerned that his cumulative actions and attitude over the course of the training program

reflected poorly on his judgment overall."  Id. ¶ 12.  Meinck states that an engineer "regularly

makes decisions critical to the safety of thousands of individuals and good judgment is essential

to the position."  Id.  Accordingly, they were concerned that Howard's actions were "indicative

of a tendency to make poor judgments," which could affect the safety of others.  Id.

On June 26, 2008, Howard went to see Mesa at the appointed time, Meinck was also

present.  Howard Dep. at 145-46.  After Howard arrived, Mesa gave him a letter stating that his

employment was terminated due to his poor judgment as exemplified by his violation of Metro-

North Operating Rule C-d and guideline no. 20 of the Accelerated Engineer Training Program,

as well as his insubordination when confronted with these rule violations.  See Release from the

Engineer Training Program, dated June 26, 2008 (annexed as Ex. I to Motion) ("Termination

Letter"); Howard Dep. at 147.  Howard yelled and cursed at Mesa and Meinck, see Meinck Decl.

¶ 13, but Howard says he did so only because he felt intimidated, Pl. 56.1 Resp. ¶ 27.

6

The other African-American trainee in the group of 12, Kenneth Page, was not terminated and is now a locomotive engineer with MTA Metro-North.  Meinck Decl ¶ 14.

B.      Internal Investigation

After being terminated, Howard contacted Dianna Tucker, Manager of Human Resource and Diversity, alleging that he had been unfairly terminated from his job.  Email from W. Howard to D. Tucker and K. Turner, dated June 29, 2008 (annexed as Ex. 5 to Pl. 56.1 Resp.) at bates 004822-25.  Howard's wife, Stacey Howard, also sent a letter to Tucker in support of her husband's position.  Email from S. Howard to Tucker, dated June 29, 2008 (annexed as Ex. 5 to Pl. 56.1 Resp.) at bates 004835.  A copy of this email was forwarded to Howard's former supervisor, Mesa.  See Letter from Stacey Howard, dated June 29, 2008 (annexed as Ex. 5 to Pl. 56.1 Resp.) at bates 004929.

The MTA referred Howard's complaint to an outside firm for investigation.  Letter from H. Permut to W. Howard, dated Aug. 5, 2008 (annexed as Ex. 5 to Pl. 56.1 Resp.).  The Perry Law Group conducted an investigation into Howard's allegations and issued a report.  See Investigation Report.  The investigation did not find facts sufficient to support Howard's claim that he was discriminated against on account of his race.  Investigation Report at 5.  The MTA then informed Howard that it had concluded that his claims were unfounded and notified him of his right to file a discrimination claim with the New York State Division of Human Rights or the U.S. Equal Employment Opportunity Commission.  Letter from G. Bradley to W. Howard, dated Sept. 26, 2008 (annexed as Ex. 5 to Pl. 56.1 Resp.).

Howard notes that, because Mesa, Meinck, and Santiago were informed of Howard's discrimination complaint at least two weeks prior to the commencement of the outside investigation, they had an opportunity to prepare responses before the independent investigation

7

began.  See Pl. 56.1 Resp. ¶ 6 (Human Resource Officer, Mrs. Tucker).

      C.      Administrative Agency Filings

After the MTA's internal investigation was concluded, Howard filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging harassment and racial discrimination in his termination from MTA Metro-North.  Charge of Discrimination, dated Mar. 9, 2009 (annexed as Ex. K to Motion).  After investigating these charges, the EEOC concluded that MTA Metro-North's actions did not violate Title VII and issued a right to sue letter. Dismissal and Notice of Rights, dated Dec. 11, 2009 (annexed as Ex. L to Motion) ("Right to Sue Letter").

II.      APPLICABLE LAW

      A.      Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus should be left to the finder of fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

When determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party.  See id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in

8

original), and "may not rely on conclusory allegations or unsubstantiated speculation." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor . . . ." Anderson, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (internal quotation marks, citation, and brackets omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citation omitted); accord Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial.") (internal quotation marks and citation omitted); Feurtado v. City of New York, 337 F. Supp. 2d 593, 599-600 (S.D.N.Y. 2004).

Although the Second Circuit has noted that "an extra measure of caution" is needed in granting summary judgment in discrimination cases since direct evidence of discriminatory intent is rare, a finding of summary judgment is nonetheless appropriate for discrimination claims lacking a genuine issue of material fact. Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); see Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), cert. denied, 534 U.S. 993 (2001).

9

B.      Law Governing Discrimination Claims

Claims of discrimination under Title VII and 42 U.S.C. § 1981 are analyzed under the

framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973). See Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (Title VII), cert. denied, 549

U.S. 1282 (2007); Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 629 (S.D.N.Y.

2009) (Title VII and § 1981); Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP,

491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007) (§ 1981); see also Patterson v. McLean Credit Union,

491 U.S. 164, 186 (1989) (method of analysis and scheme of proof for disparate treatment

claims is identical under § 1981 and Title VII).  Under McDonnell Douglas, the plaintiff carries

the initial burden of establishing a prima facie case of discrimination.  See 411 U.S. at 802;

accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  This burden has been

characterized as "minimal."  McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 (2d Cir.

2006) (internal quotation marks and citation omitted); Woodman v. WWOR-TV, Inc., 411 F.3d

69, 76 (2d Cir. 2005).

To establish a prima facie case of disparate treatment, a plaintiff must show that: "(1) he

was a member of a protected class; (2) he was competent to perform the job in question, or was

performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4)

the action occurred under circumstances that give rise to an inference of discrimination."

Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) (citation omitted).  The fourth element is a

"flexible one that can be satisfied differently in differing factual scenarios."  Chertkova v. Conn.

Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996).

If the plaintiff establishes a prima facie case, a presumption of discrimination is created

and the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for

the adverse employment action.  McDonnell Douglas, 411 U.S. at 802; accord St. Mary's, 509

U.S. at 506-07; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Joseph, 465

F.3d at 90.  If the employer articulates such a reason for its action, the presumption of

discrimination is eliminated and "the employer will be entitled to summary judgment . . . unless

the plaintiff can point to evidence that reasonably supports a finding of prohibited

discrimination."  James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000) (citations

omitted).  Such evidence may include, for example, a showing that "'the legitimate reasons

offered by the defendant were not its true reasons, but were a pretext for discrimination.'"

Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (quoting Burdine, 450 U.S. at

253) (additional citation omitted).  Importantly, "'[t]he ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with

the plaintiff.'"  St. Mary's, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (alteration in

original); accord Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).  Thus, it is not

sufficient for the fact-finder to disbelieve the employer's explanation; rather, "'the fact-finder

must believe the plaintiff's explanation of intentional discrimination.'"  Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (quoting St. Mary's, 509 U.S. at 519) (emphasis

omitted).  In other words, the plaintiff "must always prove that the conduct at issue . . . actually

constituted discrimination . . . ."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81

(1998) (internal quotation marks, emphasis, and bracketing omitted).

        Nevertheless, while the plaintiff must prove that the defendant's proffered reasons for

termination were pretextual, the plaintiff is not always required to "introduce additional,

independent evidence of discrimination."  Reeves, 530 U.S. at 149.  "In appropriate

circumstances," the evidence of pretext alone will be sufficient to "infer . . . that the employer is

dissembling to cover up a discriminatory purpose." Id. at 147.

Despite the elaborate process set up in McDonnell Douglas, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action. See, e.g., Graves v. Finch Pruyn & Co., 457 F.3d 181, 188 (2d Cir. 2006) (declining to resolve dispute regarding establishment of prima facie case of age discrimination on the ground that plaintiff had not "pointed to any record evidence to dispute [defendant's] legitimate reason . . . for the alleged adverse employment action"); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (declining to decide whether prima facie case was made because the defendant had "met its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination, and [plaintiff] ha[d] failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact"); accord Lugo v. Shinseki, 2010 WL 1993065, at *14 (S.D.N.Y. May 19, 2010); Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 439 (S.D.N.Y. 2007), aff'd, 331 Fed. App'x 874 (2d Cir. 2009).

III.    DISCUSSION

A.    Timeliness of Plaintiff's Claim

Title VII requires that a complaint be filed within 90 days of receipt of an EEOC right-to-sue letter. 42 U.S.C. § 2000e-5(f)(1). Absent evidence to the contrary, there is a presumption that a document is received three days after it is mailed. Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 525 (2d Cir. 1996). Here, Howard's EEOC right-to-sue letter is dated December 11, 2009. See Right to Sue Letter. Thus, there is a presumption that he received the letter on December 14, 2009, giving Howard until March 14, 2010 to file his complaint. Because March

14, 2010 was a Sunday, Howard had until the Monday, March 15, 2010 to file his complaint. See Fed. R. Civ. P. 6(a)(1)(C).

MTA Metro-North argues that Howard's claim is time-barred because his complaint was not filed until April 19, 2010, which is 35 days after the statutory filing period had ended. See D. Mem. of Law at 2. This argument must be rejected. Although Howard's complaint was not filed until April 19, 2010, it was stamped "received" by the Pro Se Office on March 15, 2010. See Complaint for Employment Discrimination, filed Apr. 19, 2010 (Docket # 2). At the same time that Howard submitted his complaint, he also submitted an application to proceed in forma pauperis, which was granted on April 16, 2010. See Request to Proceed In Forma Pauperis, filed Apr. 19, 2010 (Docket #1). The Second Circuit has stated that when filing is delayed due to the pendency of an application to proceed in forma pauperis, the date to determine the timeliness of a complaint is the date the pro se office received the complaint, not the date it was actually filed. Toliver v. Sullivan County, 841 F.2d 41, 42 (2d Cir. 1988). Because Howard's complaint was received by the Pro Se Office on March 15, 2010, his claim is timely.

B.      Employment Discrimination Claim

As noted above, if MTA Metro-North has offered a facially neutral reason for Howard's termination, our analysis of Howard's claim may start with the final step of the McDonnell Douglas framework. Here, MTA Metro-North states it terminated Howard because he was absent from his work site without authorization and that he showed poor judgment by being insubordinate. See Termination Letter; Meinck Decl. ¶¶ 12-13; Bradley Decl. ¶¶ 2, 3. This constitutes a facially neutral reason for his termination. See, e.g., Phillips v. Mt. Sinai Med. Ctr., 2006 WL 177155, at *3 (S.D.N.Y. Jan. 24, 2006) (plaintiff's failure to follow instructions constituted a legitimate reason for terminating her employment).

13

Accordingly, we now consider whether Howard has submitted admissible evidence that would allow a reasonable jury to conclude that the reason given by the MTA is pretextual and that the real reason he was terminated was because of his race.

Howard has pointed to several pieces of evidence in his effort to prove discrimination. First, Howard has provided some evidence that Meinck treated Howard differently with respect to providing answers to test questions.  See Pl. 56.1 Resp. ¶ 9; Howard Dep. at 75.  This evidence has little power, however, in light of the small number of students in Howard's class and the absence of any evidence whatsoever as to how Meinck treated students in other groups. Most importantly, Meinck, the person who allegedly discriminated against Howard, gave him a passing grade on all of the necessary tests, and Howard graduated from the Harlem line to the Hudson line.  Howard Dep. at 57.  Notably, the fact that Howard had not performed well on any tests was not referenced as a grounds for his termination.  See Termination Letter.

Howard also points to the conduct of his second supervisor, Santiago.  An unidentified person told Howard that Santiago had made negative comments about him in front of a group of locomotive engineers when Howard was not present to the effect that Howard was "never prepared."  Howard Dep. at 112-13.  These comments too are of limited value to show racial discrimination as Howard has not put forth any evidence regarding how Santiago viewed other students or remarks Santiago made about other students.  Nor has he provided evidence as to Santiago's role in the decision to terminate him.

Howard also points to the fact that some MTA Metro-North employees shared allegedly confidential information relating to Howard after he made his discrimination complaint, which prompted some of them to prepare a "rebuttal" to Howard's charge before the outside investigation began.  See Pl. Affirm. at 3; Pl. 56.1 Resp. ¶ 6.  However, this allegedly improper

14

conduct occurred only after Howard's termination, see Pl. 56.1 Resp. ¶ 6, and therefore sheds little light on whether or not the MTA Metro-North terminated Howard because of his race.

On June 4, 2008, several weeks prior to his termination, Mesa issued Howard a letter of warning for missing a train.  See Warning Letter; Howard Dep. at 93.  While Howard acknowledges that he missed the train, Howard Dep. at 93-94, he contends that non-African-American students missed trains without being issued letters of warnings, Pl. 56.1 Resp. ¶ 30, Pl. Affirm. at 4.  Nonetheless, Howard himself acknowledged that he had previously missed trains and had not been issued a formal letter of warning for missing those trains.  Howard Dep. at 99. He does not offer any evidence suggesting whether any of the other trainees were not issued a warning when they missed a train in circumstances similar to Howard's.  He also conceded that he does not know whether the other African-American student in his program received any disciplinary or warning letters about missing trains.  Id. at 106.  Additionally, when asked during his deposition whether he had any evidence suggesting that his being issued a warning letter was related to racial discrimination, Howard answered "I don't have none" other than noting that he was the only black student in his class.  Id. at 107-08.

Howard's main effort to show pretext centers on his contention that he did not act improperly when he left his post to copy the study guides.  The rule cited by MTA Metro-North, Rule C(D) in its termination letter states that all employees must "report for duty at the required time at the designated location."  MTA Metro-North Railroad Operating Rules, effective Apr. 3, 2005 (annexed as Ex. H to Motion).  Howard claims that he did not violate the cited rule because in fact he originally reported on time.  Pl. 56.1 Resp. ¶ 24; Pl. Mem. of Law at 12-13.  But while Howard reported to work on time, he subsequently left his designated work location for approximately two hours.  See Howard Dep. at 131; D. 56.1 Stat. ¶ 20.  A reasonable reading of

Rule C(D) would require workers not merely to report on time but actually to remain on "duty" after they had done so.  In any event, the issue before the Court is not specifically whether Howard violated the work rule but whether the employer actually believed he had done so.  See generally Pacenza v. IBM Corp.,  2009 WL 890060, at *14 (S.D.N.Y. Apr. 2, 2009) ("[A]n employer must merely have a good faith belief in the articulated reason for an employee's termination."); see also McPherson, 457 F.3d at 216 (the court is "decidedly not interested in the truth of the allegations against plaintiff," but is rather interested in what "'motivated the employer'") (emphasis in original) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)); Forrester v. Rauland-Borg Corp., 453 F.3d 416, 417 (7th Cir. 2006) ("[A]s we have said countless times, the question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground.") (citation omitted).  There is little basis other than speculation on which a jury could find that the MTA did not believe that Howard violated this rule when he left his work post.

Howard points to the fact that he asked the engineer on duty for permission to leave and that the engineer said he could do so.  E.g., Pl. Affirm. at 2.  While Howard does not agree with Meinck's assertion that trainees had been told that engineers could not give them permission to leave the work site, see Meinck Decl. ¶ 10; Pl. 56.1 Resp. ¶ 6 (Instructor John Meinck), he never suggests that Meinck or anyone else had informed him that engineers actually had such authority.  Indeed, he admits that the trainees had been specifically told that an engineer could not give a trainee permission to go home, to run a train while the engineer slept, or to study if the student was not operating a train.  Pl. Affirm. at 2.

In any event, Howard has provided no evidence that other individuals violating this rule –
or some equivalent rule – in circumstances similar to his own were not subjected to termination.
See generally Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1563 (11th Cir. 1987)
(plaintiff who alleges discrimination must provide evidence that "other employees not within the
protected class who engaged in similar acts were not similarly treated"); accord Hamilton, 528 F.
Supp. 2d at 442.  Indeed, there is no evidence as to whether other individuals have been
terminated from the program by the MTA and if so for what reasons.  The record is thus devoid
of any evidence that would allow the inference that the MTA treated Howard differently from
the way it would have treated any other employee who had done what he had done.  As the
Second Circuit has noted, to show that similarly situated individuals were treated differently, a
plaintiff "has to show that [individuals in the non-protected group] engaged in comparable
conduct."  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).  To meet this
burden, it is insufficient to offer "little more than conclusory statements" or "sweeping
allegations unsupported by admissible evidence."  Id. at 65.

Additionally, all of Howard's evidence must be viewed in light of the fact that Howard
was not the only black student in the program, Howard Dep. at 65.  As noted, the other African-
American trainee in the group of twelve, Kenneth Page, was not terminated and is today a
locomotive engineer.  Meinck Decl ¶ 14.  While Howard emphasizes that he was the only black
student in his four-person training group, see Howard Dep. at 106-08; Pl. Affirm. at 4, the
decision to give him a warning letter and terminate him was made by Mesa, who was in charge
of the entire program, see Bradley Decl. ¶ 2; Howard Dep. at 100.

Finally, Howard's argument that his termination was discriminatory is further undercut
by the fact that the person who chose to fire him, Mesa, was also one of Howard's interviewers.

17

Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997).  During the interview process, Mesa gave Howard the highest marks of the three interviewers.  See Mesa Interview (giving Howard a 14 out of 14 rating); Anderson Interview (giving Howard 13 out of 14); Tucker Interview (giving Howard 13 out of 14).  Howard argues that this fact is not relevant because Mesa's actions violated an MTA Code of Ethics policy that prohibits MTA employees from both hiring and supervising an employee.  Pl. Mem. of Law at 6.  But even if Mesa violated the Code, that violation could not alter the inference of a lack of discriminatory intent that exists when the same person both hires and fires a person during a short period.  Grady, 130 F.3d at 560.  While courts have declined to apply this principle when the person doing the hiring has some other incentive for hiring the employee, see Jetter v. Knothe Corp., 324 F.3d 73, 76 (2d Cir. 2003), there is no evidence that there was any such incentive here.

      C.      § 1981 Claim

     42 U.S.C. § 1981 allows a plaintiff to sue a municipality under the theory that the alleged discriminatory acts were "performed pursuant to a municipal policy or custom."  Patterson, 375 F.3d at 226 (citing Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 733-36 (1989) (§ 1981) (additional citations omitted).  It is unclear if Howard means to pursue such a claim against the MTA.  But to the extent he is doing so, any such claim must fail.  To prevail on a § 1981 claim, Howard must show that the violation of his right to sue "was caused by a custom or policy within the meaning of [Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978)]."  Jett, 491 U.S. at 735-36.  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy."  City of Oklahoma City v. Tuttle, 471 U.S. 808, 841 (1985) (internal quotations omitted).  Here, there is no evidence

18

at all of a custom or policy by the MTA to engage in racial discrimination against locomotive engineer trainees.

*     *     *

In conclusion, the Court notes that it can understand how the circumstances of Howard's termination could be viewed by him as unfair. The power to set aside an employer's decision as unfair, however, has not been accorded to this Court. Rather, plaintiff's ability to obtain relief rises or falls solely based on whether he has provided enough evidence on this motion to allow a jury to find that his termination was motivated by his race. The evidence presented would not permit such a finding. Accordingly, this Court is unable to provide plaintiff with any relief.

IV.    Conclusion

For the foregoing reasons, MTA Metro-North's motion for summary judgment (Docket # 22) is granted. The Clerk is requested to enter judgment and to close this case.

Dated: November 7, 2011
      New York, New York

                                       GABRIEL W. GORENSTEIN
                                       United States Magistrate Judge

Copies sent to:

Wendell R. Howard
56 25th Street
Troy, NY 12180

Joshua Fay
MTA Metro-North Railroad
347 Madison Ave., 19th Floor
New York, NY 10017

19